******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANTOINE KEATON
## (SC 20845)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. While investigating the shooting, the police interviewed the defendant. At the outset of the interview, the defendant informed the interviewing detectives that his father had spoken with an attorney on his behalf and that the attorney would not be available until later that day. The defendant then asked the detectives whether he was under arrest or whether he was free to leave. In response, they told the defendant that they could not provide him with any answers to his questions unless he executed a written waiver of his rights under *Miranda* v. *Arizona* (384 U.S. 436). When the detectives asked the defendant to initial and sign the written waiver, he specifically indicated that he wanted his attorney. As the detectives began to leave the interrogation room, they informed the defendant that they were questioning him in connection with a murder investigation. Thereafter, the defendant agreed to speak to them without his attorney present, and they read him his *Miranda* rights from a second waiver of rights form, which the defendant initialed and signed. During the remainder of the interview, the defendant admitted that he was in the vicinity of the shooting when it occurred and identified himself in a compilation of video footage captured around the time of the shooting from video cameras mounted on public streets and in still photographs derived from that footage. At trial, defense counsel did not object to the testimony of one of the interviewing detectives describing the defendant's interview and the waiver of his rights. Moreover, when the prosecutor sought to admit into evidence a video recording of the police interview and the waiver of rights form, defense counsel stated that he had no objection to their admission. On appeal, the defendant claimed that the admission of the compilation of video footage violated his constitutional right of confrontation and, in seeking reversal of his conviction, urged this court to invoke its supervisory authority to either adopt a prophylactic rule requiring the police, upon learning that a suspect is represented by counsel, to immediately cease questioning until counsel is present, or to conclude that the defendant's right to counsel was violated under the circumstances of this case. *Held*:

The defendant's claim that the trial court had violated his constitutional right of confrontation by admitting the compilation of video footage, insofar as a computer program was used to manipulate the unedited video footage in order to create the compilation and he was entitled to cross-examine the program's developer, failed under the third prong of *State* v. *Golding* (213 Conn. 233), as defense counsel affirmatively waived the defendant's claim.

Defense counsel clearly and unequivocally stated, "[n]o objection," in response to the prosecutor's offer of the video compilation into evidence, counsel did not question the detective, who testified for the state regarding the video compilation, about its contents, purpose, or creation, and counsel instead strategically chose to refer to the compilation during closing argument in arguing to the jury that the defendant was one of a number of individuals in the video footage dressed in a white T-shirt and blue shorts.

Alternatively, the record was inadequate for this court to review the defendant's confrontation claim, as the record did not reveal whether the video compilation, which was a synchronized sequence of discrete images, constituted hearsay or whether it was testimonial in nature.

 The defendant's claim that the police had violated his constitutional right to counsel by improperly questioning him without his attorney present was unpreserved and, therefore, was not reviewable under *Golding*, as defense counsel stated "[n]o objection" in response to the admission into evidence of the recorded police interview and the waiver of rights form, and the defendant's conviction was not subject to reversal under the plain error doctrine.

Moreover, this court declined the defendant's request to exercise its supervisory authority to reverse the defendant's conviction, either by adopting a prophylactic rule requiring the police, upon learning during a custodial interrogation that a suspect is represented by counsel, to immediately cease all questioning until counsel is present, or by reaching the merits of the defendant's claim that his right to counsel was violated.

This court was not persuaded that existing constitutional safeguards, announced in cases such as *Edwards* v. *Arizona* (451 U.S. 477) and *State* v. *Purcell* (331 Conn. 318), that protect a suspect's right to counsel in situations in which the suspect, during interrogation, asks for counsel or makes an equivocal request for counsel, were inadequate or that a more stringent rule was necessary for the fair administration of justice.

Argued March 11—officially released July 28, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Schuman*, *J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed*.

*Laila M. G. Haswell*, senior assistant public defender, with whom, on the brief, was *Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's

attorney, and *Robert Diaz*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. A jury found the defendant, Antoine Keaton, guilty of murder in violation of General Statutes § 53a-54a and criminal possession of a firearm in violation of General Statutes (Rev. to 2019) § 53a-217. On appeal, the defendant claims that (1) the admission of certain video evidence at trial violated his confrontation clause rights under the sixth amendment to the United States constitution, and (2) we should exercise our supervisory authority to reverse his conviction by either (A) adopting a new, bright-line rule requiring that, whenever the police learn that a suspect in custody and subject to interrogation is represented by counsel, regardless of whether counsel is present or the suspect has invoked his right to counsel, they must immediately cease all questioning until counsel is present, or (B) concluding that his right to counsel was violated. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On July 12, 2019, the defendant and the victim, Anthony Wright, attended a nighttime street vigil in Hartford. During the vigil, the victim socialized with friends at a street intersection, while the defendant stood with a group of individuals on the stoop of a nearby apartment building. After spending some time on the stoop, the defendant walked to a package store, purchased a small bottle of alcohol, and returned to the stoop. Approximately fifty minutes later, the defendant left the stoop and walked toward the intersection where the victim was speaking with his friends. Upon reaching the intersection, the defendant fired a gun at the victim, who collapsed. The defendant immediately fled the scene, and the victim was later pronounced dead.

During the investigation, the Hartford police obtained closed-circuit camera footage from street cameras located throughout the city. Investigators then used a computer

program known as Milestone to compile and synchronize footage from those cameras in the vicinity of the shooting. The resulting video depicted a man wearing a white T-shirt and dark pants entering and exiting the package store and later approaching the victim at the intersection, shooting the victim, and fleeing the scene. After reviewing this footage and interviewing witnesses present on the night of the shooting, the police identified the defendant as a potential suspect. A few days later, Detectives Jeffrey Pethigal and James Newell interviewed the defendant at the Hartford Police Department. During the recorded interview, the defendant reviewed the street camera footage and identified himself as the individual wearing a white T-shirt who was seen entering and exiting the package store, and as that same individual in a still frame of the video captured approximately fifteen seconds before that individual shot the victim.

At trial, the prosecutor introduced into evidence both the Milestone video compilation and the video recording of the defendant's police interview. The prosecutor argued that the Milestone compilation, together with the defendant's identification of himself as the individual wearing a white T-shirt, established that he was the shooter who killed the victim. The jury found the defendant guilty of murder and criminal possession of a firearm. The court rendered judgment in accordance with the jury's verdict and sentenced the defendant to fifty-five years of imprisonment. The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court violated his confrontation rights under the sixth amendment to the United States constitution[1] by improperly admitting into evidence the Milestone compilation of footage captured by the street cameras. He contends that, because

---

[1] The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

the Milestone program "manipulat[ed]" the underlying, unedited video footage used in the prosecution, he was entitled to cross-examine the program's developer. The defendant acknowledges that this claim was not preserved at trial and therefore seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[2] In response, the state argues that the claim was affirmatively waived by defense counsel and that the record is inadequate for review. We agree with the state.

The following additional facts are pertinent to our resolution of this claim. On the first day of trial, Steven Citta, a detective with the Hartford Police Department, was called to testify regarding the Milestone program and the video compilation. Detective Citta explained that the Hartford police have access to a series of street cameras throughout the city and that the footage from the cameras is uploaded and stored at the Capitol Command City Center (C4). Once recorded and saved, the police are unable to add or omit anything to or from the footage. He explained that C4 uses the Milestone program, which allows the police to create video compilations based on the stored footage. The Milestone software allows the police to select which saved camera footage they want to include, along with the time parameters of the footage, and then it "automatically formats" and "scrunches [the footage] down" so that the separate video feeds appear as one synchronized video. Detective Citta testified that, during the investigation, the police selected stored footage from five cameras that had captured the intersection where the shooting occurred, as well as the surrounding

---

[2]Under *Golding*, a defendant may prevail on an unpreserved claim if "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

streets. The Milestone program synchronized the selected video feeds, generating a compilation in which five separate frames displayed the events of the night within a single screen. The compilation also included precise date and time references to the events that night. When asked on direct examination if the Milestone program has glitches, Detective Citta acknowledged that he was "not an IT professional," but he indicated that the system may experience brief glitches, issues connecting to the server, or issues with motion sensitive cameras failing to record because of a lack of movement.

After Detective Citta testified on direct examination, the prosecutor offered the Milestone compilation into evidence. In response, defense counsel stated, "[n]o objection," and the trial court admitted the Milestone compilation as a full exhibit. The trial court asked defense counsel if he would like to cross-examine Detective Citta, to which defense counsel replied, "[n]o questions, Your Honor." The prosecutor then called Detective Pethigal, who testified about the events depicted in the Milestone compilation and to previously showing the defendant still photographs taken from the video. In closing argument, defense counsel referred to the Milestone compilation as evidence establishing that multiple people near the vigil had worn a white T-shirt and blue shorts that matched those of the suspect.[3]

In addressing a confrontation clause claim, well established principles guide our analysis. "The confrontation clause bars admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." (Internal quotation marks omitted.) *State* v. *Villanueva*, 352 Conn. 439, 470, 337 A.3d 734 (2025), quoting *Crawford* v.

---

[3] During his interview with the police, the defendant indicated that he thought he was wearing "black pants" on the night of the incident, and the individual he identified as himself in the security camera footage and still photographs was wearing dark pants. During closing argument, however, defense counsel argued that the defendant, along with multiple other people at the vigil, was wearing blue shorts.

*Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The confrontation clause "bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted." (Internal quotation marks omitted.) *Smith* v. *Arizona*, 602 U.S. 779, 785, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024). In addition, it "applies only to testimonial hearsay"—a category whose contours have been "variously described." (Internal quotation marks omitted.) Id., 784. Although "there is no comprehensive definition of testimonial," courts "largely [have] focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes." (Internal quotation marks omitted.) *State* v. *Bester*, 353 Conn. 720, 732, 347 A.3d 146 (2025). Thus, "the threshold inquiries [for purposes of] a confrontation clause analysis are whether the statement was hearsay, and if so, whether the statement was testimonial in nature . . . . These are questions of law over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Villanueva*, supra, 470.

*Golding* review of confrontation clause claims is often unavailable because the claim was either waived at trial or the record is inadequate for review on appeal. See *State* v. *Bester*, supra, 353 Conn. 729 (observing that *Golding* review in this context is available for "narrow class of unpreserved but not affirmatively waived confrontation clause claims . . . when a constitutional violation is apparent from an adequate record"). "A waived claim, as opposed to an unpreserved claim, does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Culbreath*, 340 Conn. 167, 179, 263 A.3d 350 (2021). "A defendant, or his counsel, may abandon the defendant's constitutional right to confrontation, either expressly or impliedly by . . . deliberate action." (Internal

quotation marks omitted.) *State* v. *Hinton*, 352 Conn. 183, 203, 336 A.3d 62 (2025).

"To be effective . . . defense counsel's waiver must be knowing and intelligent." *State* v. *Culbreath*, supra, 340 Conn. 181. In our adversary system, a trial court is entitled to presume that counsel is familiar with the relevant constitutional principles and acts competently to safeguard a defendant's constitutional rights. See, e.*g.*, *State* v. *Holness*, 289 Conn. 535, 544, 958 A.2d 754 (2008). As a result, we have held that defense counsel effectively waives a claim under the confrontation clause if he or she affirmatively states to the court that they do not object to the admissibility of a particular piece of evidence. See, e.*g.*, *State* v. *Iverson*, 352 Conn. 422, 436–37, 336 A.3d 1212 (2025) (defense counsel waived confrontation clause claim when he responded, " '[n]o, Your Honor,' " to court's inquiry of whether he objected to admission of autopsy report); *State* v. *Hinton*, supra, 352 Conn. 204–205 (defense counsel waived confrontation clause claim when he responded, "[u]nder that [ground], no, Your Honor," and, "[n]o objection," to court's question of whether he objected to admission of recorded interview under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)); see also *State* v. *Culbreath*, supra, 182 (defense counsel affirmatively waived constitutional claim under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when he stated, " '[n]o objection,' " to admission of defendant's recorded interview and written statements). To hold "otherwise would require the trial court to canvass defense counsel with respect to counsel's understanding of the relevant constitutional principles before accepting counsel's agreement on how to proceed . . . [and] there is nothing in our criminal law that supports such a requirement." (Internal quotation marks omitted.) *State* v. *Bellamy*, 323 Conn. 400, 419, 147 A.3d 655 (2016).

In the present case, defense counsel affirmatively waived the defendant's confrontation clause claim.

Counsel clearly and unequivocally stated, "[n]o objection," in response to the prosecutor's offer of the Milestone compilation into evidence. This statement, made without qualification, operates as a waiver of the defendant's confrontation clause claim on appeal, and the claim thus fails under *Golding*'s third prong.

Our conclusion that defense counsel waived the defendant's confrontation clause claim is buttressed by counsel's tactical use of the Milestone compilation at trial. On direct examination of Detective Citta, the prosecutor established the foundation for the admission of the Milestone compilation and offered it in evidence. Defense counsel neither challenged the admission of the Milestone compilation nor questioned Detective Citta about its contents, purposes, or creation. Instead, defense counsel utilized the Milestone compilation in his closing argument, arguing to the jury that the defendant was not the only individual in the vicinity of the shooting dressed in blue shorts and a white T-shirt. These decisions by defense counsel suggest that his affirmative waiver to the admission of the Milestone compilation was based in part on trial strategy.

The defendant contends that the United States Supreme Court's recent decision in *Smith* v. *Arizona*, supra, 602 U.S. 779, precludes any conclusion that defense counsel waived the defendant's confrontation clause claim because that decision changed the controlling law on the confrontation clause that was in effect at the time of the defendant's criminal trial. He asserts that *Smith* outlined the rights that an individual possesses under the confrontation clause, such that defense counsel would have objected or developed the record differently if *Smith* had been decided prior to trial. We are not persuaded. Although we have explained that, "when the law governing a defendant's constitutional claim has changed after the defendant's trial, counsel acting under binding precedent in effect at the time of the trial cannot make a knowing and intelligent waiver of rights affected by the later decision changing the

law"; *State* v. *Johnson*, 345 Conn. 174, 188–89, 283 A.3d 477 (2022); we are not presented with such circumstances here. As we recently explained, *Smith* did not materially change the law governing the confrontation clause analysis. See *State* v. *Iverson*, supra, 352 Conn. 438. In fact, *Smith* confirmed that the confrontation clause applies to statements conveyed by an out-of-court forensic analyst, which is consistent with controlling precedent in existence since at least 2011. Id. Accordingly, the defendant's confrontation clause claim was waived by defense counsel and, thus, fails under the third prong of *Golding*.

Additionally, we conclude that record developed at trial is inadequate for this court to review the defendant's claim. The record does not reveal whether the Milestone compilation, which is a synchronized sequence of discrete images, itself is hearsay. See *State* v. *Villanueva*, supra, 352 Conn. 472 ("the overwhelming weight of authority suggests that [photographs] are not hearsay unless the photographs contain words, markings, or some other indicative contention that can reasonably be understood as an assertion"). Further, the record lacks evidence that the compilation was testimonial in nature, as neither Detective Citta's testimony nor Detective Pethigal's testimony explained why it was created or whether it was prepared with litigation in mind. See *State* v. *Bester*, supra, 353 Conn. 734–35. As such, the defendant's claim is also unreviewable under the first prong of *Golding*.[4]

## II

The defendant next claims that the police violated his right to counsel under *Edwards* v. *Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) and *State* v. *Purcell*, 331 Conn. 318, 362, 203 A.3d 542 (2019), by improperly questioning him without his

---

[4]The defendant alternatively argues that we should remand the matter for a hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 732–33, 756 A.2d 799 (2000), so that he can supplement the record to allow this court to review his claim. Because we conclude that his claim was waived and therefore fails under *Golding*, we decline to address this claim.

attorney present.[5] He acknowledges that his unpreserved claim is unreviewable under *Golding* and is not subject to reversal under the plain error doctrine. Nonetheless, he requests that we exercise our supervisory authority to reverse his conviction and to adopt a new, bright-line rule requiring that, whenever the police learn that a suspect in custody and subject to interrogation is represented by counsel, regardless of whether counsel is present or the suspect has invoked his right to counsel, they must immediately cease all questioning until the suspect's attorney is present. In the alternative, he requests that we invoke our supervisory authority to reverse his conviction by concluding that the police either did not honor his unambiguous assertions of the right to counsel or did not clarify his ambiguous requests for counsel. The state argues that we should not invoke our supervisory authority to review the defendant's expressly waived claim. We agree with the state that the exercise of our supervisory authority to reverse the defendant's conviction is not warranted in the present case.

The following additional facts are relevant to our analysis. On July 15, 2019, the defendant was interviewed by Detectives Pethigal and Newell at the Hartford Police Department because of his suspected involvement in the shooting. At the outset of the interview, the defendant informed the detectives that his father had talked to an attorney on his behalf and that the attorney would not be available until later in the day. The defendant did not say whether he had spoken personally to the attorney. During the early portion of the interview, the defendant was primarily concerned with determining whether he was under arrest and whether he could leave the interview. However, the detectives informed the defendant that they could not provide him with any answers unless he executed a written waiver of his *Miranda* rights.

---

[5]After the parties completed briefing the confrontation clause issue, addressed in part I of this opinion, the defendant moved this court for permission to raise this issue by way of supplemental briefing. We granted that motion over the state's opposition.

The defendant agreed that the detectives could advise him of his rights, and they proceeded to read him a *Miranda* form that listed the rights he was electing to waive. As the detectives read from the waiver of rights form, the defendant continued to agree, until the detectives advised him of his right to an attorney and instructed him to sign and initial the form. At this point, the defendant again asked the detectives if he was under arrest and, if he was not under arrest, whether he could leave. The detectives told the defendant that he was under arrest but that they could not tell him the basis for the arrest or any other information at that point unless he was willing to speak with them. The defendant asked whether he could call his father to have him call his attorney, to which Detective Pethigal asked, "[l]isten, do you want your lawyer here right now, or do you want to speak to us," and the defendant answered, "[h]ell yeah, I want my lawyer." Detective Pethigal replied, "[y]ou want your lawyer? All right." And, as Detective Pethigal stood up to leave the interview room, the defendant stated, "[b]ecause you all don't want to tell me nothing." The detectives then repeated that the defendant was under arrest and gathered their materials.

As the detectives began to exit the interview room, the defendant asked if they could tell him anything, and they replied, "[m]urder." The defendant then inquired, "[m]urder for what," and, as Detective Pethigal stood in the doorway facing the defendant, he stated, "[m]urder. We can't talk to you. You don't want to talk to us, all right? If you want—if you want to talk to us, you want to change your mind, let us know. But we got to go through this form again. If you want to tell us your side of the story, it's up to you. But we can't do anything without you agreeing to speak to us." The defendant acknowledged that they could talk but stated, "you all are not— you all were not trying to tell me shit, like . . . ." The detectives told the defendant that they would not talk with him unless he signed the form and agreed to speak to them. The defendant confirmed that he wanted to speak with the detectives and that they would "tell [him]

everything that's going on." The detectives explained that they would get a new waiver of rights form and, in response to the defendant's question, told the defendant that he could use the phone at any time to call his father, who could in turn call his attorney, and that he could stop talking at any time. The detectives proceeded to confirm with the defendant that he had an attorney representing him and that he was willing to speak without the attorney present. The detectives then reviewed a second waiver of rights form with the defendant, which he signed and initialed. Over the course of the remainder of the interview, the defendant admitted that he was in the vicinity of the shooting and identified himself as the man in the white T-shirt in the video footage and still photographs.

At trial, Detective Pethigal testified regarding his interview with the defendant. He explained that, during the initial interview, he attempted to review the waiver of rights form with the defendant. He testified that this conversation, however, stopped and was resumed when the defendant indicated that he wanted to know more information about the evidence that the detectives had. Detective Pethigal then explained that he went through a second waiver of rights form with the defendant, which was signed and initialed by the defendant. Defense counsel did not object at any point during the testimony describing the initial interview proceeding or the defendant's waiver. Thereafter, the prosecutor offered the recording of the interview and both waiver of rights forms into evidence, and defense counsel stated, "[n]o objection," to each one. On cross-examination, defense counsel did not elicit any information about the circumstances leading to the interview or ask any questions about the defendant's waiver of rights, instead focusing on the failure of the police to request a search warrant for the defendant's home and the failure of the police to obtain handwritten statements.

Because defense counsel affirmatively waived any claim about the admission of the recorded interview and the two waiver of rights forms when he stated, "[n]o objection,"

the defendant recognizes that any claim concerning his constitutional right to counsel "is probably unreviewable under *Golding* and [for] plain error."[6] He therefore does not brief claims under either doctrine and requests only that this court exercise its supervisory authority to reverse his conviction. We are mindful that our "[s]upervisory authority is an extraordinary remedy that should be used sparingly . . . ." (Internal quotation marks omitted.) *In re Aisjaha N.*, 343 Conn. 709, 724, 275 A.3d 1181 (2022). "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of

[6]The terminology in our decisions governing waiver of appellate claims can be a source of confusion. We first labeled certain waivers of appellate review as "affirmativ[e]" waivers in *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009). We stated in *Mozell* that, "when a right has been affirmatively waived at trial, we generally do not afford review under either *Golding* or the plain error doctrine." Id. With respect to plain error, as opposed to *Golding*, that view was based on our agreement with the Appellate Court's decisions in *State* v. *Corona*, 69 Conn. App. 267, 274, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002), and *State* v. *Wilson*, 52 Conn. App. 802, 809–10, 729 A.2d 778 (1999). Those decisions, in turn, had relied solely on the federal plain error doctrine as applied by the Seventh Circuit Court of Appeals in *United States* v. *Lakich*, 23 F.3d 1203, 1207–1208 (7th Cir. 1994). See *State* v. *Wilson*, supra, 810; see also *State* v. *Corona*, supra, 274–75 (quoting *Wilson*). We subsequently held, however, that waiver for purposes of *Golding* and plain error are not always coterminous. See *State* v. *McClain*, 324 Conn. 802, 805, 155 A.3d 209 (2017) (under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), implied waiver of claim of instructional error "does not necessarily foreclose plain error review of that same claim"). In reaching that conclusion, we determined that, for purposes of delineating the contours of plain error waiver, "federal case law is inapposite and unpersuasive on the basis of the fundamental differences between the federal and state plain error and waiver doctrines." *State* v. *McClain*, supra, 813 n.8. Because the defendant has not briefed, and therefore has abandoned, any plain error claim in the present case, we have no occasion to address whether *Mozell* remains good law after *McClain*.

the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010).

Under the circumstances of the present case, we decline to invoke our supervisory authority to reverse the defendant's conviction by adopting the rule he proposes or by concluding that his right to counsel was violated.[7] In *Miranda* v. *Arizona*, supra, 384 U.S. 478–79, the United States Supreme Court held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. If a suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. See, e.*g.*, *North Carolina* v. *Butler*, 441 U.S. 369, 372–76, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). The United States Supreme Court has explained that the right to counsel established in *Miranda* was one of a "series of recommended 'procedural safeguards'" that "were not themselves rights protected by the [c]onstitution but were instead measures to [e]nsure that the right against compulsory self-incrimination was protected." *Michigan* v. *Tucker*, 417 U.S. 433, 443–44, 94 S. Ct. 2357, 41 L.

[7]In support of his argument for a new, bright-line prophylactic rule, the defendant argues that these circumstances are no different from those in *State* v. *Stoddard*, 206 Conn. 157, 161–62, 166, 537 A.2d 446 (1988), in which law enforcement failed to inform the defendant in that case of efforts by his counsel to provide the defendant with legal assistance. We concluded that the Connecticut constitution requires that the police conducting a custodial interrogation of a suspect inform the suspect of their attorney's efforts to provide legal assistance and that, because there was a reasonable likelihood that the defendant would have invoked his right to counsel had the police fulfilled their duty to inform, a new trial was required. Id., 166–67, 176–77. The circumstances of the present case are distinguishable from those in *Stoddard*. There is no evidence in the record in the present case to suggest that the police precluded his counsel from contacting the defendant or failed to inform the defendant of any communications from counsel.

Ed. 2d 182 (1974); see also *Vega* v. *Tekoh*, 597 U.S. 134, 142, 142 S. Ct. 2095, 213 L. Ed. 2d 479 (2022).

After *Miranda* was decided, the court in *Edwards* v. *Arizona*, supra, 451 U.S. 484–85, determined that additional prophylaxis was necessary, aimed at preventing the police from badgering a defendant into waiving his previously asserted *Miranda* rights. The court held that, if a suspect requests counsel at any time during the interview, he may not be subjected to further questioning until a lawyer has been made available or the suspect himself reinitiates communication. Id. Following *Edwards*, however, there were still some unresolved questions about what a suspect must do to effectively invoke his right to counsel. In *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the court explained that "the suspect must unambiguously request counsel." The court clarified that, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. **(Emphasis in original.)** Id. The court concluded that there was no requirement that law enforcement clarify an ambiguous request for counsel. Id., 461–62.

In *Purcell*, this court adopted a more protective prophylactic standard under our state constitution than what the United States Supreme Court required in *Miranda* v. *Arizona*, supra, 384 U.S. 478–79, and its progeny. See *State* v. *Purcell*, supra, 331 Conn. 321. Specifically, we held that, "if a suspect makes an equivocal statement that arguably [could] be construed as a request for counsel," all questioning "must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." **(Internal quotation marks omitted.)** Id., 362. Notably, the question in *Purcell* was not whether the Connecticut constitution provides a broader constitutional right than the federal constitution but

"whether to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under *Miranda*." Id., 342. We relied in part on "the fact that Connecticut has had a long history of recognizing the significance of the right to counsel, even before the right attained federal constitutional importance." (Internal quotation marks omitted.) Id., 345.

The rule we announced in *Purcell* is a robust safeguard for defendants—it acts as an additional protection of the constitutional guarantee of the right to counsel. Defendants since *Purcell* have invoked that precedent in this court to challenge violations of their right to counsel. See, e.g., *State* v. *Johnson*, 354 Conn. 96, 108–109, 349 A.3d 260 (2026); *State* v. *Culbreath*, supra, 340 Conn. 185–86, 191. We are thus not persuaded that, at this juncture, the existing constitutional safeguards, particularly those established in *Purcell* and *Edwards*, are inadequate to protect the rights of defendants or that the defendant's more stringent rule is necessary for the fair administration of justice. See, e.g., *State* v. *Castillo*, 329 Conn. 311, 337, 186 A.3d 672 (2018) (declining to exercise supervisory authority when defendant "has not demonstrated that the claimed problem is a pervasive one").

It bears emphasis that the constitutional protections articulated in *Purcell* and *Edwards* were firmly established well before the defendant's criminal trial. *Purcell*, decided in March 2019, predated the defendant's police interview by approximately four months and his trial by more than three years. Defense counsel did not, however, raise those constitutional protections as a basis to suppress the defendant's statements or to object to the testimony of Detective Pethigal describing the defendant's interview. Further, the defendant makes no plain error claim, and he affirmatively waived any *Golding* claim under either *Purcell* or *Edwards* when his counsel stated, "[n]o objection," to the admission of the recorded interview and the two waiver forms, focusing

his questioning instead on other areas of the investigation. See, e.*g.*, *State* v. *Johnson*, supra, 354 Conn. 108 (affirmatively waiving *Miranda* claim at trial); *State* v. *Culbreath*, supra, 340 Conn. 182 (same). As we have made clear, "[t]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine." (Internal quotation marks omitted.) *State* v. *Turner*, 334 Conn. 660, 686–87, 224 A.3d 129 (2020).

We decline, therefore, to exercise our supervisory authority to reverse the defendant's conviction by adopting the bright-line rule he suggests or reaching the merits of his waived claim that his right to counsel was violated.[8]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[8]Nothing in this opinion should be understood as expressing the view that the police interrogation at issue in this case comported with the requirements of the United States constitution or article first, §8, of the Connecticut constitution. We hold only that the defendant waived this claim and, accordingly, do not address its merits.